**MEDIA GENERAL CABLE OF FAIRFAX, INC., Plaintiff,**

v.

**SEQUOYAH CONDOMINIUM COUNCIL OF CO–OWNERS, Defendant,**

**Amsat Communication, Inc., Proposed Intervenor–Defendant.**

**Civ. A. No. 89–1077–A.**

United States District Court, E.D. Virginia, Alexandria Division.

Oct. 5, 1989.

David C. Kohler and E. Ford Stephens, Christian, Barton, Epps, Brent & Chappell, Richmond, Va., for plaintiff.

Stephen R. Pickard, Alexandria, Va., for defendant.

Robert Rowan, Arlington, Va., for proposed intervenor-defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### Introduction

■ This declaratory judgment action is a dispute between a condominium association and a cable television company concerning the placement of cable television facilities on the condominium complex's common areas. At issue specifically is whether Section 621(a)(2) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 541(a) (the Act), confers on cable television franchise holders a privately enforceable right of access to compatible use easements existing in their franchise area.[1] As an added ingredient, the cable operator currently serving the condominium complex seeks first to intervene, either as a matter of right, Fed.R.Civ.P. 24(a)(2), or permissively, Fed.R.Civ.P. 24(b)(2), and then to dismiss the complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., for failure to state a claim.

For the reasons stated here, intervention as a matter of right is denied, but permissive intervention is granted. Further, the motion to dismiss is denied as the Court concludes that Section 621 does authorize a private right of action to enforce its terms. The record is not adequately developed at this stage, however, to permit the Court to decide whether a right of access to compat-

---

1. Because this case raises a question arising under federal law, this Court properly has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

ible use easements exists under the specific circumstances at bar.

### Background

Plaintiff, Media General Cable of Fairfax, Inc. (Media General), is a cable television company organized and operated under the laws of Virginia. It is the holder of a nonexclusive franchise to provide cable television services in the geographical area where the Sequoyah Condominium is located.

Sequoyah Condominium (Sequoyah) is an 1100 unit condominium complex located in Fairfax County, Virginia. The units fall into three distinct architectural designs: (1) adjoining townhouses,[2] (2) three-story garden style units,[3] and (3) five-plex units.[4] The interiors of each residential unit are owned by the individual unit owners.[5] The common areas, including the building exteriors and grounds, are held collectively by the unit owners as tenants in common.[6] The unit owners, in turn, are members of defendant, Sequoyah Condominium Council of Co–Owners (the Council), which is the organization responsible for administering the complex and the common areas and arranging for their management.

The proposed intervenor, Amsat Communication, Inc. (Amsat), like Media General, is also a provider of cable television services. It has no cable TV franchise for the surrounding area, but is the current provider of these services to Sequoyah pursuant to an exclusive contract expiring in 1998. Amsat's service is provided by means of a satellite dish and cable system,[7] all located within the Sequoyah property. While there are minor variations for each building type, the system, in general, involves master cables connecting the satellite antenna with each building. The master cables run underground along the streets of the complex until they emerge from the ground and are connected to a splitter box attached to the building's side. From this box, individual service cables run from the exterior of the building inside to individual residences while the master cable continues on to the next building.[8]

2. There are 296 townhouses in 32 buildings on four streets in the Sequoyah complex.

3. There are 87 garden style units in 9 buildings on one street in the Sequoyah complex.

4. There are 635 five-plex units in 131 buildings on 18 streets in the Sequoyah complex.

5. Sequoyah's Master Deed, Section II, provides:
HORIZONTAL AND VERTICAL BOUNDARIES: The Residences and Common Elements ... shall have horizontal and vertical boundaries as follows:
A. The centerline of the lower floor slab shall constitute the lower boundary of the Residence and the upper boundary of the general common elements or Residence below, and the interior surface of the roof shall constitute the upper boundary of a Residence which shall have no Residence above it.
B. The plane of the interior surface of exterior walls and the centerline of the party walls which separate one Residence from another shall constitute the vertical boundaries of the Residence.

6. Sequoyah's Master Deed, Sections V & VI, provide as follows:
V. GENERAL COMMON ELEMENTS: The General Common Elements of Sequoyah shall consist of all the land and buildings except those portions of buildings contained within the boundaries of a Residence, and those areas designated as Limited Common Elements.

VI. INTEREST IN COMMON ELEMENTS: (A) Ownership of the common elements as described herein shall be ... as tenants in common.

7. Such systems are frequently referred to as Satellite Master Antenna Television systems (SMATV).

8. Specifically, the five-plex buildings are served by a underground master cable from the antenna to the first building on each side of the street. The cable emerges from the ground at the first building and is connected to a splitter box attached to the side of the building. Five individual service cables proceed from the splitter box to the individual residences. The master cable then leaves the splitter box and runs to the splitter box on the second building on that side of the street via the second story wood decks of the two buildings. This arrangement continues until the cable reaches the last building on the street, where the master cable either terminates or proceeds underground to another street. Similarly, an underground cable connects to a splitter box at each three story garden-style building and individual service cables provide service to the 9–12 individual residences in each building. Finally, townhouses are served by an underground cable that connects to a splitter box attached to a building exterior. Two or three individual townhouses are served from each splitter box.

This dispute arises because Media General desires to provide cable service to certain individual residences at Sequoyah in response to requests from their owners. Media General seeks to furnish the requested service by using existing compatible utility easements to gain access to each of the individual units requesting service. The Council has refused to permit Media General to use or have access to the existing compatible easements. According to the Council, it is prohibited from giving Media General the requested access by virtue of the exclusive nature of its contract with Amsat.

The existing compatible easements Media General desires to use stem chiefly from a blanket easement that appears in the Sequoyah Condominium Master Deed. That blanket easement states:

"There is hereby granted a blanket easement upon, across, over, and under all of the property [of the Condominium] for ingress, egress, installation, replacing, repairing and maintaining a master television antenna system and all utilities including, but not limited to, water, sewers, telephones and electricity. By virtue of this easement, it shall be expressly permissible for the providing utility company to erect and maintain the necessary poles and other necessary equipment on said property and to affix and maintain utility wires, circuits, and conduits on, above, across and under the roofs and exterior walls of the residences notwithstanding anything to the contrary contained in this paragraph, ... [no utilities] may be installed or relocated on said property except as ... thereafter approved by the Council."

In addition to this broad blanket easement, certain specific easements were granted to various utilities. Among these, significantly, is the easement the Council granted to Amsat to place coaxial cables underground throughout the complex and to route these cables along the outside and inside of buildings for the purpose of providing service to individual units. Media General claims that all the utility easements, including the blanket easement, are compatible for use with its system.

Media General filed this action seeking a declaration, pursuant to 28 U.S.C. § 2201, of its right under Section 621 of the Act to construct a cable television system through the existing compatible easements at Sequoyah. Media General claims it does not seek to force its way into any residence over an owner's objection. Instead, Media General contends it seeks to serve only those unit owners who have requested its service. To do so, however, Media General must gain access to the existing compatible utility easements, access which it claims a right to under the Act. Proposed Intervenor, Amsat, seeks intervention as of right and permissively, and moves to dismiss on the ground that the Act confers no such enforceable right on Media General and hence the complaint fails to state a claim.

### Analysis

A. *Motion to Intervene.*

▮ A movant seeking intervention as a matter of right must show that "(1) it has an interest in the subject matter of the action, (2) disposition of the action may practically impair or impede the movant's ability to protect that interest, and (3) that interest is not adequately represented by the existing parties." *Newport News Shipbuilding & Drydock Co. v. Peninsula Shipbuilders*, 646 F.2d 117, 120 (4th Cir. 1981); *see also* Fed.R.Civ.P. 24(a)(2); *Merritt Commercial Sav. & Loan v. Guinee*, 766 F.2d 850, 853 (4th Cir.1985) (citing *Peninsula Shipbuilders*); *CFTC v. Heritage Capital Advisory Servs.*, 736 F.2d 384, 386 (7th Cir.1984). In holding that the NLRB had a right to intervene in *Peninsula Shipbuilders*, the Fourth Circuit found the requisite "interest in the subject matter of the action" in the Board's need "to protect its jurisdiction and processes against the possibility of a district court judgment in conflict with its own in a pending unfair labor practice proceeding." *Id.* at 122. Jurisdictional integrity is plainly a vital and legitimate NLRB interest. It is an interest central to the Board's mission and one not adequately safeguarded absent intervention. As such, it was undeniably an inter-

est sufficient to support intervention as a matter of right. Amsat has no comparable interest here. At best, Amsat's interest is limited to potential, indeed speculative, competitive injury. Such an interest does not rise to the level required for intervention as a matter of right. Precisely this conclusion was reached recently by a district court in an essentially similar case. In *Rollins Cablevue v. Saienni Enters.*, 115 F.R.D. 484 (D.Del.1986) (hereinafter *Rollins*), the plaintiff, a franchised cable service provider, brought suit to enjoin the owner of a multiple unit apartment complex and an unfranchised rival company from interfering with plaintiff's installed cables and from installing and operating another cable television system at the complex. After threshold motions, the claim against the rival company was dismissed because the court concluded there was no explicit or implicit cause of action in the Act for a franchised cable operator to enjoin an unfranchised one. *Id.* at 485. Left standing was plaintiff's suit against the owner to enjoin the latter from removing or tampering with the plaintiff's installed cables. The basis of plaintiff's suit against the owner was the claim that Section 621 conferred on plaintiff, as a franchise holder, the right to use the compatible use easements without interference. At this point, the successor company to the just-dismissed rival sought intervention, *inter alia,* on the ground of potential competitive injury. The court denied intervention as a matter of right noting that the proposed intervenor's interest was "speculative and inadequate." *Id.* at 487. The reasoning in *Rollins* applies with equal force here and the same result should obtain. Media General does not seek in this action to bar Amsat from providing cable services to the complex. Instead, Media General seeks only to establish its right under Section 621

of the Act to gain access to the complex via existing compatible easements.

The heart of this case is the interpretation of Section 621. By no means can it be said that Amsat, as a potential competitor of a cable TV company, has an interest in the interpretation of the Act sufficient to support mandatory intervention. Were that so, as the *Rollins* court put it

> Chaos would result if every citizen 'interested' in the outcome of new legislation were permitted to intervene in litigation interpreting the legislation. The interest of the [proposed] intervenor must be more particularly in the subject matter of the lawsuit.

115 F.R.D. at 487. Significant, too, is that Amsat is not a franchised cable operator for the area; it operates a satellite antenna and cable system located within the property boundaries of the complex. Whether the result in this lawsuit would have any competitive impact on Amsat is problematical. In sum, therefore, Amsat's competitive interest here is as speculative and inadequate as was the interest of the proposed intervenor in *Rollins*. It is too speculative and inadequate to support intervention as a matter of right.[9] Because the Court concludes that Amsat lacks the requisite interest to warrant intervention as of right, it is unnecessary to consider whether the remaining Rule 24(a)(2) requirements are met.

■ Although mandatory intervention is inapposite, permissive intervention stands on a different footing. It requires less. Specifically, there must be a timely application showing that the proposed intervenor's claim or defense and the main action have a question of law or fact in common. Fed.R. Civ.P. 24(b)(2). The applicant, in general, must also show an independent jurisdictional basis.[10] If such showings are made, the

**9.** This is not to say that competitive injury can never be an interest sufficient to support intervention as a matter of right. On the contrary, as *Feller v. Brock,* 802 F.2d 722 (4th Cir.1986) holds, under appropriate circumstances actual competitive injury that is not tangential to the issues in litigation can warrant intervention. *See also Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,* 386 U.S. 129, 87 S.Ct. 932, 17

L.Ed.2d 814 (1967). It is not true, however, as Amsat claims, that any competitive injury suffices no matter how speculative or tangential. Were the law otherwise, entities would be allowed to intervene whenever a competitor sued or was sued in order to assist the competitor's adversary.

**10.** *See Spring Constr. Co. v. Harris,* 614 F.2d 374, 377 (4th Cir.1980); *Francis v. Chamber of Com-*

applicant may be permitted to intervene unless the court, in its sound discretion, determines that the intervention will unduly delay or prejudice the rights of the original parties. *Id.; see also Hill v. Western Elec. Co.*, 672 F.2d 381 (4th Cir.1982) (most important consideration in passing on application for intervention is whether delay has prejudiced other parties); *Rollins*, 115 F.R.D. at 488–89 (permissive intervention denied because of potential for expansion of issues and commensurate delay).

The case at bar fits squarely within these requirements. Amsat's principal claim or defense is substantially identical to that of the Council, namely that Section 621 creates no private right of action and, in any event, does not apply in the circumstances of this case. Amsat may also raise questions concerning whether certain easements Media General proposes to use are dedicated compatible use easements and whether their use is technologically feasible. The claims plainly include questions of law and fact in common with, if not identical to, the main claim. Moreover, the Court will ensure that Amsat's intervention does not significantly expand the issues to be litigated. Thus, no potential for prejudice or delay is apparent. Under these circumstances, permissive intervention is appropriate [11] and will be ordered.

## B. *Motion to Dismiss.*

■ At the center of this controversy is the purpose and effect of Section 621(a)(2) of the Act. It states:

Any [cable television] franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and *through easements, which is [sic] within the area to be served by the cable system and which have been dedicated for compatible uses,* except that in using such easements the cable operator shall ensure—

(A) that the safety, functioning, and appearance of the property and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;

(B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both; and

(C) that the owner of the property be justly compensated by the cable operator for any damages caused by the installation, construction, operation, or removal of such facilities by the cable operator.

47 U.S.C. § 541(a)(2) (emphasis added). The express terms of this statute purport to create a legal right. But before the Court can address the nature or scope of that right, the threshold question presented is whether this provision creates a private right of action in favor of a cable operator seeking access to compatible easements within its franchise area. A negative answer ends the case adversely for Media General. But an affirmative answer makes it necessary then to consider a second question, namely whether the Act confers on Media General, a franchised cable operator, any enforceable rights of access under the facts at bar. Here, too, a negative answer would end the case adversely for Media General. For, even assuming a private right of action under Section 621, it would not apply where, for example, the requisite compatible easements did not exist. *See Cable Holdings of Georgia v. McNeil Real Estate Fund VI*, 678 F.Supp. 871, 875 (N.D.Ga.1986) (cable operator could not construct its system through utility easements that had expired or did not yet exist).

Although not yet decided in this Circuit, the question whether Section 621 creates a private right of action was considered in *Centel Cable Television Co. v. Admiral's*

*merce,* 481 F.2d 192, 195 n. 6 (4th Cir.1973) (some exceptions exist to the requirement for an independent jurisdictional basis).

**11.** *Cf. Cox Cable Communications v. United States,* 699 F.Supp. 917, 924 (M.D.Ga.1988)

(where no undue prejudice or delay would result, present cable franchise holder allowed to intervene permissively in prior franchise holder's suit against franchising authority challenging non-renewal of the franchise).

*Cove Assocs.*, 835 F.2d 1359 (11th Cir.1988). In a well-reasoned opinion, the Eleventh Circuit held that a franchised cable service provider had an implied right of action under Section 621 to compel access to compatible use easements for the purpose of serving a residential community within the franchised area. *Id.* at 1364. In reaching this conclusion, the Court had to ascertain "whether Congress intended to create, ... by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979); *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). That inquiry required the Court to apply the four step test established by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975):

(1) Was plaintiff one of the class for whose especial benefit the statute was enacted,—that is, did the statute create a federal right in favor of the plaintiff?

(2) Was there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

(3) Was it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

(4) Was the cause of action one traditionally relegated to state law, ... so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. at 2088 (citations omitted).

As the *Admiral's Cove* opinion makes clear, answers to these four questions with respect to Section 621 point persuasively to the existence of a private right of action. That franchise holders, like Media General, are members of a class for whose "especial benefit" the Section was enacted is not open to serious doubt. By its terms, the Section authorizes cable franchise holders to lay their cables along utility easements. Additionally, legislative history indicates that Congress intended Section 621 to authorize cable operators to "piggy back" on easements "dedicated for electric, gas or other utilities." H.R.Rep. No. 934, 98th Cong., 2d Sess. 59, *reprinted in* 1984 U.S. Code Cong. & Admin.News 4655, 4696. It seems clear, therefore, that Section 621 confers a federal right on cable franchisees. Also clear from the legislative history is that Congress intended to provide a cause of action. The Act was enacted "to create an environment in which cable will flourish, providing all Americans with access to a technology that will become an increasingly important part of our national communications network." *Id.* at 20, *reprinted in* 1984 U.S.Code Cong. & Admin.News 4655, 4657. As the *Admiral's Cove* Court's analysis confirms, this statement clearly supports a Congressional intention to provide a private federal right of action to ensure that the Act's ultimate purpose would be achieved. Similarly, the *Admiral's Cove* analysis demonstrates that a private right of action is consistent with the statutory scheme and is not one traditionally relegated to state law. Accordingly, this Court adopts the reasoning of the Eleventh Circuit in *Admiral's Cove* in concluding that Section 621 justifies the implication of the private right of action for franchised cable operators to gain access to compatible use easements within their franchise area.

Most courts faced with this issue have reached the same conclusion. *See Cable TV Fund 14–A v. Property Owners Ass'n Chesapeake Ranch Estates*, 706 F.Supp. 422 (D.Md.1989) (private right of action exists to grant a cable operator a preliminary injunction under Section 621 to prevent competitor, utility, and developer from interfering with operator's use of compatible easements) (citing *Admiral's Cove* ); *Cable Assocs. v. Town & Country Mgmt. Corp.*, 709 F.Supp. 582 (E.D.Pa.1989) (private right of action exists under Section 621 to compel access to compatible use easements dedicated for public use) (citing *Admiral's Cove* ); *Centel Cable Television Co. v. Burg & DiVosta Corp.*, 712 F.Supp. 176 (S.D.Fla.1988) (cable operator granted a preliminary injunction under Section 621 to prevent developer from interfering with operator's use of compatible easements); *Ca-*

ble Holdings of Georgia v. McNeil Real Estate Fund VI, 678 F.Supp. 871 (N.D.Ga. 1986) (Section 621 grants right of access through compatible use easements); Rollins Cablevue v. Saienni Enters., 633 F.Supp. 1315 (D.Del.1986) (Section 621 gives franchise holder a right of access to compatible use easements, but no private right of action exists for a franchised cable operator to enjoin an unfranchised rival from constructing and operating a competing system); Greater Worcester Cablevision v. Carabetta Enters., 682 F.Supp. 1244 (D.Mass.1985) (Section 621 grants right of access through compatible use easements but not to install cables beyond existing easements); cf. Rollins Cablevue v. Saienni Enters., 115 F.R.D. 484 (D.Del. 1986) (rival unfranchised entity denied intervention in action where remaining claim concerned whether Section 621 prevented owner from tampering with existing system installed along easements).

Amsat claims the Third Circuit's decision in Cable Investments v. Woolley, 867 F.2d 151 (3rd Cir.1989) is contrary to Admiral's Cove and to the result reached here. It is not; closely read, Woolley is factually distinguishable from the case at bar. Moreover, the Third Circuit explicitly declined to intimate any opinion on the existence of a private right of action under the Admiral's Cove facts. A review of Woolley is instructive. In essence, the Woolley plaintiff, a non-exclusive cable franchise holder, brought an action to require the owner of two apartment complexes to allow the plaintiff access to provide service to tenants. The significant distinction between Woolley and the case at bar is that there, unlike here, the plaintiff was seeking more

than just access to existing compatible use easements. Instead, the Woolley plaintiff was seeking access to the insides of buildings and apartments where no easements existed. Also significant was that access was being sought on the request of tenants, but against the wishes of the fee simple owner. The Third Circuit concluded that the terms and legislative history of Section 621 furnished no support for a right of access to the insides of buildings and apartments against the owner's wishes and in the absence of any easements. In the words of the opinion,

> We find no support in the express language of the statute for Cable Investments' position that Congress authorized franchised cable companies to force their way onto private property, over the protests of the property owner, in order to offer cable television service to the tenants of the property owner.

867 F.2d at 155. Because the plaintiff sought forced access in the absence of easements, the Third Circuit found Admiral's Cove distinguishable. Id. at 154. For the same reason, it also found it unnecessary to reach the general question whether Section 621 creates an implied right of action where access is sought only to existing compatible easements. Id. at 161.[12] The essential distinction between Admiral's Cove and Woolley may be summed up as that between an easement situation (Admiral's Cove) and a no easement situation (Woolley). In the former situation, Admiral's Cove concludes, and this Court agrees, that Section 621 provides a privately enforceable remedy. In the latter, Woolley holds that it does not.[13]

---

12. See also Cable TV Fund 14–A, 706 F.Supp. at 429 (in Woolley, "it was not necessary to reach the issue whether a private right of action can be implied under the Cable Act to enforce the right asserted").

13. Central to the Third Circuit's conclusion in Woolley was its view that Congress' deletion of Section 633 from the final version of the Act meant that cable service providers could not condemn or take property under the Act. The deleted Section 633 had provided procedures for just compensation. Its deletion, in the view of the Woolley court, indicated that Congress did not intend to empower cable service providers

to go beyond existing compatible use easements. Existing Section 621 provides for compensation for damages caused by the access compelled by Section 621. The Third Circuit in Woolley distinguished between just compensation for a taking (deleted Section 633) and just compensation for damages short of taking (existing Section 621). For reasons noted in the text infra., it is unclear at this point whether this case presents this question. If presented, this Court considers that Woolley correctly concluded that the deletion of Section 633 means that the Act did not authorize takings. But see Greater Worcester Cablevision v. Carabetta Enters., 682 F.Supp.

Given the existence of a Section 621 private right of action, the issue then arises whether such an action applies in the circumstances at bar. Put another way, now that the Court has concluded that Section 621 empowers Media General to sue to gain access to compatible use easements in the condominium complex, the next question presented is whether appropriate, qualifying easements exist from the point Media General's cable would enter the complex all the way to the inside of each of the units requesting service. If so, then Section 621 would operate to provide the remedy Media General seeks. If not, however, the situation presented would then resemble more closely the facts in *Woolley*. As it happens, the record at present is insufficiently developed to enable the Court to determine with precision how Section 621 might apply to the circumstances at bar. Accordingly, the Court considers that the goals of Rule 16(a), Fed.R.Civ.P., would be furthered by the scheduling of a pretrial conference and by requiring the parties, by counsel, to confer concerning certain issues for the purposes of stipulating uncontested facts and focusing sharply the issues in contention. Specifically, the Court directs that the parties, by counsel, confer in person or by telephone to develop stipulated facts and to frame the contested issues, if any, on the following topics:

(1) Identify and describe with particularity each easement Media General contemplates using to provide cable TV service to requesting unit owners in the Sequoyah complex.

(2) Whether any taking of property would be involved in Media General's provision of service to requesting unit owners and, if so, identify each taking.

(3) Whether each of the easements Media General contemplates using has been "dedicated[14] for compatible uses."

(4) Whether Media General's access to any existing dedicated compatible use easements amounts to an additional servitude on the underlying property and if so, whether it is a taking.

(5) Whether Media General's access to any existing dedicated compatible use easements can be accomplished consistent with Section 621(a)(2)(A) and (B).

(6) Whether installation of Media General's cables in existing dedicated compatible easements will occasion the need for just compensation pursuant to Section 621(a)(2)(C).

(7) Whether Media General seeks access to existing dedicated compatible use easements even if the facts ultimately show that such easements, by themselves, would not permit Media General to reach the requesting unit owners without crossing over private property controlled by the Council.

Counsel are directed to confer on these matters on or before October 16, 1989. Facts stipulated as a result of the conference or conferences must be jointly submitted by October 20, 1989. By the same date, counsel are directed to submit individually to the Court their list of contested issues. Thereafter, a pretrial conference will be held at 2:00 p.m. on October 27, 1989 and the parties may submit legal memoranda on any points they deem pertinent by October 25, 1989.

1244, 1259 (D.Mass.1985), *cited with approval in Cable Holdings of Georgia v. McNeil Real Estate Fund VI,* 678 F.Supp. 871, 874 (N.D.Ga.1986) (Section 621(a)(2) includes just compensation for taking).

**14.** The parties should also be prepared to discuss whether "dedicated" compatible easements include only those dedicated for public purposes, or whether any private utility-type easement would be satisfactory. *Compare Cable Assocs. v. Town & Country Mgmt. Corp.,* 709 F.Supp. 582, 584, 589 (E.D.Pa.1989) ("dedicated" easements require a conveyance to the public) *with Cable Holdings of Georgia v. McNeil Real Estate Fund VI,* 678 F.Supp. 871, 873 (N.D.Ga. 1986) ("dedicated" easements include private easements set apart for compatible uses).